**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANTHEM SPORTS, LLC et al<br>    Plaintiffs,<br><br>v.<br><br>UNDER THE WEATHER, LLC et al<br>    Defendants. | No. 3:17cv596 (MPS) |

## RULING ON MOTION TO DISMISS

Plaintiffs Anthem Sports, LLC ("Anthem"), and Griffin Global Products, LLC, bring this suit against Under the Weather, LLC ("UTW"), and Eric Pescovitz, its principal, for various intellectual property and other claims arising from the marketing and sale of "sportspods," i.e., small tents for viewing outdoor sporting events during inclement weather. The plaintiffs set out eight counts in their amended complaint: (i) a request for a declaratory judgment of non-infringement with regard to various patents owned by UTW (count one); (ii) a request for a declaratory judgment of invalidity with respect to various patents owned by UTW (count two); (iii) a request for a declaratory judgment of non-infringement and invalidity with respect to a trademark asserted by UTW (count three); (iv) various violations of the Lanham Act (count four); (v) common law trademark infringement (count five); (vi) tortious interference with business expectancies (count six); (vii) violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (count seven); and (viii) common law unfair competition (count eight). The defendants move to dismiss all of the plaintiffs' counts save for the third. (ECF No. 41-1 at 2). For the following reasons, the defendants' motion is granted in part and denied in part.

## I.     Factual Allegations

The plaintiffs make the following factual allegations in their amended complaint, which I assume to be true.

Anthem is "a family-owned business and premier nationwide distributor of brand name sporting goods and equipment" that "primarily does business online through its website, through company catalogs, and [through] significant advertising and marketing efforts through its social media accounts." (ECF No. 38 at ¶ 2).  UTW is an Ohio company in possession of various patents[1] ("Patents-in-Suit") that "purport to claim certain rights in designs for personal enclosures that protect the user from weather while watching sporting events ('UTW Personal Enclosure[s]')." (*Id.* at ¶¶ 4, 10).  When UTW "first began selling the UTW Personal Enclosures, [it] was unable to garner significant interest in the market and struggled to make appreciable sales." (*Id.* at ¶ 11).  Around the fall of 2014, "Anthem became aware of the UTW Personal enclosures and approached UTW to establish an exclusive online distribution relationship." (*Id.* at 12)  Through "Anthem's extensive efforts in early 2015, . . . the UTW Personal Enclosures gained traction in the marketplace and became commercially successful. . . ." (*Id.* at ¶ 13).  At this point, "UTW and Anthem entered into an agreement in Connecticut whereby Anthem would be the exclusive online distributor of UTW Personal Enclosures other than UTW, who would continue to sell UTW Personal Enclosures online." (*Id.* at ¶ 14).  The

---

[1] The patents are as follows: U.S. Patent Nos. D776,779 ("the '779 Patent"), D776,778 ("the '778 Patent"), D776,777 ("the '777 Patent"), D725,735 ("the '735 Patent"), D711,998 ("the '998 Patent"), D711,997 ("the '997 Patent"), D711,996 ("the '996 Patent"), D691,690 ("the '690 Patent"), D691,689 ("the '689 Patent"), D691,688 ("the '688 Patent"), D790,026 ("the '026 Patent"), D790,023 ("the '023 Patent"), D790,024 ("the '024 Patent"), and D790,025 ("the '025 Patent").

parties discussed forming a partnership, but these discussions dissipated after UTW declined to respond to Anthem's proposed "partnership term outline." (*Id.* at ¶ 15).

The parties' relationship collapsed shortly thereafter. UTW "raised the prices for the UTW Personal Enclosures sold to Anthem" to the point where Anthem could no longer afford to purchase and sell them. (*Id.* at ¶ 16). UTW then began selling the enclosures "to major sporting goods retailer DICK's Sporting Goods, [which] in turn" offered them for sale online. (*Id.* at ¶ 17). Anthem subsequently located a different manufacturer and "began offering all weather personal enclosure products under the trade names UnderCover™ and SportPod™, including SoloPod™, Action Pod™, TeamPod™, and BugPod™ (collectively, the 'Anthem Pods')"; Anthem ensured that none of these products "infringe[d] any valid or enforceable claim of the Patents-in-Suit." (*Id.* at ¶ 18). Subsequent to "Anthem's adoption and use of the trademark SportPod™," UTW began using "the mark 'Sportspod' to refer to multiple goods" that it offered for sale. (*Id.* at 19). "Anthem did not authorize UTW to use its SportPod™ mark, and the 'SportsPod' mark is confusingly similar and likely to cause confusion, mistake, or deception as to the source of UTW's goods, and is likely to cause confusion, mistake, or deception as to whether UTW's products are associated, affiliated, or connected with or approved or sponsored by Anthem." (*Id.*).

Despite Anthem's precautions concerning the Patents-in-Suit, UTW subsequently demonstrated "that it believes [that] Anthem . . . is allegedly infringing upon UTW's rights in the Patents-in-Suit. . . ." (*Id.* at ¶ 22). "On or about April 7, 2017, one of UTW's principals left a voicemail for one of Anthem's principles" stating as follows:

> Hey Mark, it's Rick; just got an email from Anthem with your new products. I shouldn't sound surprised, I assume that's how you work. I just [sic] letting you know, and you can tell your friend Shanghai Eversuccess as well, they will be sued as well as you, I have the

patent on that design, so, and if you think I'm kidding, there will be a lawsuit for you next week. Just letting you know.

(*Id.* at ¶¶ 22-23). UTW has also "made threats against Anthem, its supposed supplier, and customers that the Anthem Pods allegedly infringe one or more claims of the Patents-in-Suit." (*Id.* at ¶ 26). Further, UTW "recently sued another personal enclosure product supplier . . . for infringement of four of the Patents-in-Suit . . . in the Southern District of Ohio." (*Id.* at ¶ 20).

UTW has also waged a campaign against Anthem's products on Facebook.com. "On numerous occasions and without justification, [Defendant] Pescovitz, UTW, or its representatives have responded to customer comments indicating a desire to purchase Anthem Pods" on Anthem's web page on Facebook.com with the following comments: (i) that the "only place to get [Anthem Pods] is undertheweatherpod.com,"; (ii) that the Anthem Pods "are illegal knockoffs and very poor quality," and that the "legal ones are only available at undertheweatherpods.com"; and (iii) that the Anthem Pods were "[Pescovitz's] idea and patent"; (iv) and that the Anthem Pods are "complete knock offs." (*Id.* at ¶ 25).

## II.    Legal Standard

Under Fed. R. Civ. P. 12(b)(6), the Court must determine whether plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted)). While the Court must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and

provides no factual support for such claims. . . ."  *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004).

### III.    Discussion

### A.  The Patent Claims (Counts One and Two)

The defendants make two arguments with respect to the plaintiffs' patent claims.  First, they contend that there is no actual case or controversy for the purposes of the Declaratory Judgment Act with respect to four newly issued UTW patents first mentioned in the plaintiffs' operative amended complaint—the '023 Patent, the '024 Patent, the '025 Patent, and the '26 Patent ("new patents").  (ECF No. 41-1 at 5).  Second, they aver that the plaintiffs' second count requesting a declaratory judgment of invalidity as to the Patents-in-Suit fails to set out a plausible claim.  (*Id.* at 7-8).  I address each of these contentions in turn.

### 1.  The New Patents

The Declaratory Judgment Act provides, in relevant part, as follows:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).  With respect to patents, the Declaratory Judgment Act ("the Act") "can prevent patent owners from brandishing a Damoclean threat with a sheathed sword" by enabling a competitor to secure legal certainty when the patent owner informs prospective customers that the competitor is infringing.  *Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 878 (Fed. Cir. 2008) (quoting *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988), *overruled on other grounds by MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).  Prior to the Act, "competitors victimized by that tactic were rendered helpless and immobile so long as the patent owner refused to grasp the nettle and sue."  *Arrowhead Indus.*

*Water, Inc.*, 846 F.2d at 735. The Act provides these competitors with the ability to "clear the air by suing for a judgment that would settle the conflict of interests" once and for all. *Id.*

The remedy of the Act is not available in all budding disputes. Article III of the Constitution restricts the scope of the Act to instances involving actual "[c]ases" or "[c]ontroversies", as opposed to "difference[s] or dispute[s] of a hypothetical or abstract character." *Mathews Intern. Corp. v. Biosafe Engineering, LLC*, 695 F.3d 1322, 1328 (Fed. Cir. 2012) (internal quotation marks omitted). There is no "facile, all-purpose standard to police the line between declaratory judgment actions which satisfy the case or controversy requirement and those that do not." *Cat Tech LLC*, 528 F.3d at 879. Rather, "the analysis must be calibrated to the particular facts of each case, with the fundamental inquiry being 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties, having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id.* (quoting *MedImmune*, 549 U.S. at 127 (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941))).

The Supreme Court's decision in *MedImmune* "'lowered the threshold' for establishing the existence of an actual case or controversy in intellectual property-related declaratory judgment cases." *Gelmart Indus., Inc. v. Everready Battery Co.*, 120 F. Supp. 3d 327, 331 (S.D.N.Y. 2014) (quoting *AARP v. 200 Kelsey Assocs., LLC*, No. 06 Civ. 81, 2009 WL 47499, at *6 (S.D.N.Y. 2009)). Prior to *MedImmune*, "the test for 'actual case or controversy' had two prongs: '(1) has the defendant's conduct created a real and reasonable apprehension of liability on the part of the plaintiff, and (2) has the plaintiff engaged in a course of conduct which has brought it into adversarial conflict with the defendant.'" *Windstream Servs., LLC v. BMG Rights Mgmt. (US) LLC*, No. 16CIV5015KMWRLE, 2017 WL 1386357, at *4 (S.D.N.Y. 2017)

(quoting *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595 (2d Cir. 1996)). After *MedImmune*, the inquiry into whether a case or controversy exists in intellectual property cases turns on "whether the adversity of legal interests that exists between the parties is real and substantial and admi[ts] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 95-96 (2d Cir. 2011) (internal quotation marks omitted). In addition, "the threat of future litigation remains relevant in determining whether an actual controversy exists." *Id.* Since "[d]eclaratory judgment actions are particularly useful in resolving trademark disputes . . . the finding of an actual controversy should be determined with some liberality." *Gelmart*, 120 F. Supp. 3d at 331 (quoting *Starter Corp.*, 84 F.3d at 596)).

Even when an actual controversy exists, however, a district court's decision to exercise jurisdiction over a declaratory judgment action is discretionary. *See Matthews Intern. Corp.*, 695 F.3d at 1328 n. 3 ("[E]ven if a case or controversy exists, the trial court has significant discretion in determining whether or not to exercise declaratory judgment jurisdiction."). The Second Circuit has set out a five factor test to guide courts in exercising this discretion:

> (i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata ; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy.

*The New York Times Co. v. Gonzalez*, 459 F.3d 160, 167 (2d Cir. 2006) (internal quotation marks omitted).

The defendants contend that the plaintiffs have failed to demonstrate the existence of a case or controversy with respect to the new patents given that the events asserted in the plaintiffs' complaint took place several months before their issue. (ECF No. 41-1 at 6). But the

operative inquiry is whether the newly added patents are likely to fall within the same case or controversy that the defendants concede exists with respect to the other Patents-in-Suit, (*see* ECF No. 47 at 3). According to the plaintiffs' complaint, all of the Patents-in-Suit pertain to designs for "personal enclosures that protect the user from weather while watching sporting events." (ECF No. 38 at ¶ 10). Further, a principal of UTW has threatened to sue Anthem over, at the very least, more than one of the Patents-in-Suit. (*Id.* at ¶ 23). It is also apparent from the attachments to the complaint that the dispute between the parties involves the right to market and sell a single type of product—small tents or pods designed for viewing sporting events. The newly issued patents pertain to the same type of product. Thus, given the general threats of litigation defendants have allegedly already made, the plaintiffs have a justifiable concern that the defendants could bring suit for infringement of the new patents, along with the other Patents-in-Suit. This is enough to create an actual case or controversy concerning the new patents at this stage of the litigation, and it also shows that a declaratory judgment would offer relief from uncertainty and serve a useful purpose in clarifying the legal issues involved. *See Banff, Ltd. v. Federated Dept. Stores, Inc.*, 841 F.2d 486, 493 (2d Cir. 1988) (party's intention and ability to sell goods potentially violative of mark created justiciable controversy); *contrast Matthews Intern. Corp.*, 695 F.3d at 1328 (no justiciable controversy where plaintiff did not present evidence that it could potentially infringe defendant's patents).

The case of *In re Dr. Reddy's Labs., Ltd.*, No. 01 CIV. 10102 (LAP), 2002 WL 31059289 (S.D.N.Y. 2002), is instructive on this point. In *Dr. Reddy's Labs*, a party sought a declaratory judgment of non-infringement with respect to several patents, all of which dealt with the drug omeprazole. *Id.* at *3. The plaintiff grounded his claim on several Wall Street Journal articles suggesting that the defendant would bring potential infringement suits against "generic

omeprazole manufacturers." *Id.* at *7. While the *Dr. Reddy's* court acknowledged that "two of the three patents upon which [the plaintiff sought] a declaratory judgment had not yet been issued" at the time of the publication of the articles, it nonetheless concluded that a case or controversy existed with respect to the newly issued patents given the defendant's broad threat against omeprazole manufacturers. *Id.* at *8-9. Here, as in *Dr. Reddy*, the defendants' alleged threats applied to a broad category of patents—those pertaining to UTW's Personal Enclosures—of which the new patents are a part. Thus, there is a case or controversy concerning the new patents.

The defendants contend also that there cannot be an actual case or controversy over the new patents because they were approved after the plaintiff filed this suit. (ECF No. 41-1 at 6). While the defendants are correct that a party "seeking to establish declaratory judgment jurisdiction bears the burden of demonstrating that an Article III case or controversy exists at the time the claim for declaratory relief [was] filed," *Matthews Intern. Corp.*, 695 F.3d at 1328; *see also Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1344 (Fed. Cir. 2007) ("The burden is on the party claiming declaratory judgment jurisdiction to establish that such jurisdiction existed at the time the claim for declaratory relief was filed and that it has continued since."), that principle does not assist them here given that the new patents were approved before the filing of the plaintiffs' operative complaint. The Federal Rules expressly contemplate updating pleadings to take account of actionable events occurring after the original complaint is filed, *see* Fed. R. Civ. P. 15(d), and the plaintiffs' operative complaint now refers to fourteen patents, all of which have been approved, instead of the ten patents that had been approved when the case started. Given that the new patents were approved before the filing of the plaintiffs'

amended complaint, (*see* ECF No. 46 at 8), they fall within the same case or controversy as the other Patents-in-Suit.

As such, I conclude that a justiciable case or controversy exists with respect to the new patents. Further, I choose to exercise jurisdiction over the plaintiffs' claims to help clarify this controversy and to relieve the plaintiffs from uncertainty over the validity of their continued production and distribution of the Anthem Pods.[2] I therefore deny the defendants' motion to dismiss with respect to the new patents.

## 2. Patent Invalidity

The defendants contend that the plaintiffs' invalidity claim fails because it does not "identify a single fact or . . . provide any explanation as to how any of the [fifteen prior art references in the plaintiff's complaint] invalidate any of the fourteen Patents-in-Suit." (ECF No. 41-1 at 7 (emphases omitted)).[3] A person is not entitled to a patent if "the claimed invention was

---

[2] It is worth noting that jurisdiction under the Declaratory Judgment Act is not necessarily permanent. If the defendants assert counterclaims for patent infringement against all of the Patents-in-Suit other than the new patents, I may revisit whether I have continuing jurisdiction over them. *See Streck, Inc. v. Research & Diagnostic systems, Inc.*, 665 F.3d 1269, 1283 (Fed. Cir. 2012) (affirming district court's conclusion that it lacked jurisdiction over non-infringement counterclaims after plaintiff declined to bring corresponding infringement claims and counterclaimant failed to show that jurisdiction continued to exist).

[3] The plaintiffs' complaint provides, in relevant part:

The Patents-in-Suit are invalid under 35 U.S.C. §§ 102 and/or 103 in light of the prior art, including without limitation the Black Pearl Tiki Tent Pop-Up Changing Room and Tanning Tent (see, e.g., Exhibit G), the Pop Up Spray Tanning Tent (see, e.g., Exhibit H), the Insect-a-Hide Pop-Up Shelter (see, e.g., Exhibit I), U.S. App. No. 2009/0044446, U.S. Patent No. D634,932, U.S. App. No. 2006/0169310, U.S. Patent No. 7,178,538, U.S. Patent No. 7,418,919, U.S. Patent No. D559,140, U.S. Patent No. D617,841, U.S. App. No. 2007/0039640, and U.S. App. No. 2007/0193614, the '688 Patent, the '689 Patent, and the '690 Patent.

(ECF No. 38 at ¶ 47).

described in a patent . . ., or in an application for patent published . . . , in which the patent or application, as the case may be, names another inventor and was effectively filed before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(2). In addition, a "patent for a claimed invention may not be obtained . . . if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103.

Although the exact requirements for a properly pled invalidity claim vary based on the nature of the case, they generally include a description of the prior art that the allegation is based on, along with a statement of the grounds for the asserted invalidity. *See Helferich Patent Licensing, LLC v. J.C. Penney Corp.*, No. 11 CV 9143, 2012 WL 3776892, at *3 (N.D. Ill. 2012) (rejecting motion to dismiss invalidity claim setting out basis for invalidity and offering description of prior art that allegations were based on); *The Beer Barrel, LLC v. Deep Wood Brew Prod., LLC*, No. 2:16-CV-00440-DN-BCW, 2016 WL 5936874, at *6 (D. Utah 2016) (rejecting motion to dismiss invalidity claim in part on basis that plaintiff alleged that various patents constituted prior art that invalidated defendant's patents); *Crye Precision LLC v. Duro Textiles, LLC*, 112 F. Supp. 3d 69, 79 (S.D.N.Y. 2015) (dismissing invalidity claim in part on basis that plaintiff failed to identify any prior art that anticipated or rendered obvious defendant's patents).

The plaintiffs' invalidity claim, albeit brief, presents enough of a factual basis to "nudge [the claim] across the line from conceivable to plausible." *In re Fosamax Products Liab. Litig.*, No. 09-cv-1412, 2010 WL 1654156, at *1 (S.D.N.Y. 2010). In their invalidity count, the plaintiffs allege that the Patents-in-Suit are invalid under two specific provisions—35 U.S.C. §§

102 and/or 103—in light of various prior art, which is specifically cited in the complaint and examples of which are attached to the complaint as exhibits. *Contrast Info. Planning & Mgmt. Serv. Inc. v. Dollar Gen. Corp.*, No. 2:15CV206, 2016 WL 69902, at *5 (E.D. Va. 2016) (holding defendant failed to plead affirmative defense of invalidity where it "merely list[ed] code sections and fail[ed] to provide any facts to support" invalidity defense); *Gradient Enterprises, Inc.*, 932 F. Supp. 2d at 450 (dismissing non-infringement claim alleging only that patent was invalid for failure to comply with one or more of conditions for patentability set forth in 35 U.S.C. §§ 102, 103, and/or 112); *Armstrong Pump, Inc. v. Hartman*, No. 10-CV-446S SC, 2012 WL 1029645, at *2 (W.D.N.Y. 2012) (same with respect to non-infringement claim contending that various patents were invalid for failure to comply with one or more of conditions for patentability set forth in 35 U.S.C. §§ 101, 102, 103, and/or 112). Thus, the plaintiffs' invalidity claim, "while perhaps not a model of clear pleading, [is] sufficient to state a plausible claim. . . ." *PetEdge, Inc. v. Marketfleet Sourcing, Inc.*, No. CV 16-12562-FDS, 2017 WL 2983086, at *4 (D. Mass. 2017) (rejecting motion to dismiss invalidity claim alleging predicated on 35 U.S.C. §§ 102 and 103 that identified prior art).

Thus, the defendants' motion to dismiss the invalidity claim is denied.

### B. Lanham Act Claims (Count Four)

The Lanham Act provides, in relevant part, that:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's
> goods, services, or commercial activities
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to
> be damaged by such conduct.

15 U.S.C. § 1125(a)(1). The plaintiffs advance three distinct claims under the Lanham Act in count four. First, the plaintiffs advance a "false designation of origin" claim with regard to Mr. Pescovitz's comments on Anthem's Facebook.com web page ("Facebook page") allegedly implying "that the Anthem Pods are only available for purchase from UTW and that the Anthem Pods were UTW and/or Mr. Pescovitz's idea." (ECF No. 38 at ¶ 56). Second, the plaintiffs advance a "false advertising claim" with respect to Mr. Pescovitz's comments on Anthem's Facebook page alleging that the Anthem Pods are "knockoffs of very poor or inferior quality." (*Id.* at ¶ 57). Finally, the plaintiffs advance a "trademark infringement claim" concerning UTW's adoption and use of the mark "SportsPod" in light of Anthem's prior trademark, "SportPod™." (*Id.* at ¶ 58). The defendants attack all three of these claims in their motion to dismiss.

### 1. False Designation of Origin Claim

A false designation of origin claim under the Lanham Act generally applies to three types of activities: "(1) false advertising;" "(2) passing off' (also called palming off) in which A sells its product under B's name;" and (3) "reverse passing off, in which A sells B's product under A's name." *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994) (internal quotation marks omitted). Although the plaintiffs' complaint is somewhat unclear as to which category its false designation of origin claims falls into, the plaintiffs' response to the defendants' motion to dismiss suggests that they wish to bring a reverse passing off claim. (*See* ECF No. 46 at 19 ("Simply put, UTW is trying to sell the Anthem Pods as its own, using the

UTW trademark and website address to direct consumers.")).  To prevail on a reverse passing off claim, a plaintiff must establish: "(1) that the [product] at issue originated with the plaintiff; (2) that [the] origin of the [product] was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin."  *Softel, Inc. v. Dragon Med. & Sci. Communications*, 118 F.3d 955, 970 (2d Cir. 1997) (internal quotation marks omitted).

The plaintiffs' reverse passing off claim does not meet this standard.  As an initial matter, the plaintiffs' claim that Mr. Pescovitz misrepresented himself as the inventor of the Anthem Pods is a nonstarter as the Lanham Act applies to misrepresentations concerning the "origin of goods," not ideas.  *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 37 (2003) (concluding that the phrase "origin of goods" in the Lanham Act "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods"); *Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc.*, 713 F. Supp. 2d 215, 234 (S.D.N.Y. 2010) (reverse passing off claims "proscribe misrepresentations about who manufactured the product in question" but do not "cover misrepresentations about the author of an idea, concept, or communication embodied in those goods").

Mr. Pescovitz's remarks that the Anthem Pods could only be purchased from UTW fares little better.  The remarks in question, which were made on Anthem's Facebook Page and which the plaintiffs include as attachments to their complaint (*see* ECF No. 38, Exhibit F), do not actually hold out UTW as the origin of the Anthem Pods.  Rather, the majority of Mr. Pescovitz's comments state that the Anthem Pods are "knockoffs" or of "inferior quality," and that the only place to get legal "pods" is from UTW's website.  (*See* ECF No. 38, Exhibit F at 3

("You saw undertheweatherpods.com the ones you see here are patent infringing knockoffs"), 4 ("these are illegal knockoffs—only place to get them is undertheweatherpods.com"), 6 ("[t]hese are illegal knockoffs and very poor quality. The legal ones are only available at undertheweatherpods.com"), 8 ("these are illegal knockoffs-only place to purchase is underthweatherpods.com"). Especially when considered together, these comments cannot plausibly be interpreted to suggest that UTW sells Anthem Pods. Rather, they imply that Anthem sells inferior and illegal copies of UTW's pods.

The only comment mentioned in the plaintiffs' complaint that could possibly be construed as conflating UTW with Anthem instructs a commenter on Anthem's Facebook page as follows: "[Commenter name] only [p]lace to get them is undertheweatherpods.com (patent holder and inventor)." (*Id.* at 2). The context in which this comment was made, however, does not suggest that UTW is the manufacturer of Anthem Pods. Rather, Mr. Pescovitz's identification of himself as the "patent holder and inventor" implies that the Anthem Pods are being illicitly marketed, and that the only place to purchase a legal pod is UTW's website. Also, the comment in question—which, as noted, is set forth on Anthem's Facebook page—includes a hyperlink to UTW's website which clearly states "Under the Weather Pods" and contains UTW's logo. (*Id.*). Thus, at best, Mr. Pescovitz's comment presents the consumer with an alternative to the Anthem Pods, as opposed to holding out UTW as the producer of the Anthem pods. *See FragranceNet.com, Inc. v. FragranceX.com, Inc.*, 493 F. Supp. 2d 545, 551 (E.D.N.Y. 2007) (instance in which search for plaintiff's website also turned up a link to defendant's website did not give rise to passing off claim under Lanham Act because an individual conducting such a search was "simply being shown alternatives").

Thus, the plaintiffs' false designation of origin claim must be dismissed.

## 2. False Advertising Claim

The Lanham Act "makes actionable 'false or misleading descriptions or false or misleading representations of fact made about one's own or another's goods or services.'" *Boule v. Hutton*, 328 F.3d 84, 90 (2d Cir.2003) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir.2001)). To set out a false advertising claim under the Lanham Act, a plaintiff "must show either (1) that the challenged advertisement or promotion is 'literally false, *i.e.*, false on its face,' or (2) 'that the advertisement, while not literally false, is nevertheless likely to mislead or confuse customers.'" *Wellnx Life Scis. Inc. v. Iovate Health Scis. Research Inc.*, 516 F. Supp. 2d 270, 284 (S.D.N.Y. 2007) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007)). The plaintiffs' false advertising claim avers that Mr. Pescovitz's comments on Anthem's Facebook page that the Anthem Pods "were knockoffs of very poor or inferior quality misrepresent the nature, characteristics, and qualities of the Anthem Pods. . . ." (ECF No. 38 at ¶ 57); 15 U.S.C. § 1125(a)(1)(B).

The plaintiffs fail to allege a plausible false advertising claim. "[S]tatements of opinion are generally not the basis for Lanham Act liability." *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995) (citing Restatement (Third) of Unfair Competition § 3 cmt. d (1993)); *see also Coastal Abstract Service, Inc. v. First American Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) ("Statements of opinion are not generally actionable under the Lanham Act."). The reason for this limitation is that liability for false advertising extends only to false misrepresentations or "statements *of fact*." *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08CV0442(DLC), 2016 WL 815205, at *8 (S.D.N.Y. 2016) (emphasis added); *see* 15 U.S.C. § 1125(a)(1). "Thus, neither subjective claims nor mere puffing is actionable because

they cannot be proven true or false." *Randa Corp. v. Mulberry Thai Silk*, Inc., No. 00CIV.4061(LAP), 2000 WL 1741680, at *2 (S.D.N.Y. 2000).

Here, Mr. Pescovitz's statements that Anthem's products were knockoffs of inferior quality are statements of opinion and therefore do not give rise to liability under the Lanham Act. His claims that the Anthem Pods are of poor quality or of inferior quality compared to the UTW pods are classic opinions in that they cannot be proven false. *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013) (defining "statements of pure opinion" as "statements incapable of being proven false"). The comment that the Anthem Pods are "knockoffs" of the UTW pods also constitutes opinion. As an initial matter, the plaintiffs' allegations suggest that all of Mr. Pescovitz's offending statements are contained in Exhibit F to the complaint. (*See* ECF No. 38 at ¶ 25). All of Mr. Pescovitz's statements in Exhibit F that use "knockoff" pair that term with "illegal" or "patent infringing." (See ECF No. 38, Exhibit F at 3 ("You saw undertheweatherpods.com the ones you see here are patent infringing knockoffs"), 4 ("these are illegal knockoffs—only place to get them is undertheweatherpods.com"), 6 ("[t]hese are illegal knockoffs and very poor quality. The legal ones are only available at undertheweatherpods.com"), 7 ("[t]hese are illegal knockoffs and very poor quality"), 8 ("these are illegal knockoffs-only place to purchase is underthweatherpods.com"). Thus, as far as Exhibit F suggests, each of Mr. Pescovitz's assertions about "knockoffs" expresses a legal opinion. *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) ("Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact.").

The use of the term "knockoff" is itself suggestive of a legal opinion. A "knockoff" is generally defined as an unauthorized copy of something that is of inferior quality and that is sold at a lower price than the original. *See* Dictionary.com, http://www.dictionary.com/browse/knockoff?s=t (last visited Feb. 21, 2018) (defining "knockoff" as "an unlicensed copy of something . . . intended to be sold at a lower price than the original"); Black's Law Dictionary 950 (9th ed. 2009) (defining "knockoff" as "[a]n unauthorized counterfeit and [usually] inferior copy of another's product, [especially] one protected by patent, trademark, trade dress, or copyright, [usually] passed off at a substantially lower price than the original). Mr. Pescovitz's assertion that the Anthem Pods were unlicensed or unauthorized copies, and "illegal" or "patent infringing" ones at that, is ultimately his lay opinion about the finding this Court or some other court might make about infringement when the issue is litigated. The case of *Freecycle Network, Inc. v. Oey*, 505 F.3d 898 (9th Cir. 2007) is instructive on this point. *Freecycle* concerned, in relevant part, a plaintiff's claim under the Lanham Act that the defendant had disparaged its trademark by openly questioning the trademark's validity. *Id.* at 904. The parties were litigating the validity of the trademark separately at the time. *See id.* Noting that "there ha[d] been no formal determination that [the plaintiff] has trademark rights in the term," the Ninth Circuit held that the defendant's statement questioning the validity of the plaintiff's asserted mark could not be "considered a false statement of fact." *Id.* at 905. A similar observation applies to Mr. Pescovitz's "knockoff" statements, which suggested that Anthem was infringing upon the defendants' intellectual property rights—i.e., the central unresolved dispute of this case.

The plaintiff's complaint also contains a statement by Mr. Pescovitz—which is not contained in Exhibit F—averring that the Anthem pods "are complete knockoffs." (*See* ECF No.

38 at ¶ 25). This statement is an opinion for the same reasons as the statements listed above. It is also non-actionable puffery. The Second Circuit has defined "puffery" as "[s]ubjective claims about products which cannot be proven either true or false." *Time Warner cable, Inc.*, 497 F.3d at 159 (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)). It elaborated on the concept by citing a Third Circuit case defining "puffery" as "an exaggeration or overstatement expressed in broad, vague, and commendatory language"—i.e., "sales talk" that "is considered to be offered and understood as an expression of the seller's opinion only, which is to be discounted as such by the buyer." *Id.* (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939 (3d Cir. 1993) (quoting W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 109, at 756-57 (5th ed. 1984))). The term, "complete knockoff," constitutes exactly the sort of subjective hyperbole that renders a statement puffery. *See Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 526 (S.D.N.Y. 2009) ("[A]dvertising terms like 'complete' are puffery because they are subjective and cannot be proven true or false.") (citing *Lipton*, 71 F.3d at 474).

Because the offending comments about Anthem's products constitute opinion and puffery, they are not "false or misleading representation[s] of fact," 15 U.S.C. § 1125(a)(1), and do not violate the Lanham Act. I therefore grant the defendants' motion to dismiss the plaintiffs' false advertising claim.

### 3. Trademark Infringement Claim

That leaves the plaintiffs' trademark infringement claim concerning UTW's use of the mark, "SportsPod," which they contend to be confusingly similar to Anthem's trademark, "SportPod™." (ECF No. 38 at ¶ 58). "[T]he elements of a trademark infringement claim under the Lanham Act are: (1) that the plaintiff holds a valid mark entitled to protection; (2) that the defendant used the mark; (3) in commerce; (4) in connection with the sale or advertising of

goods or services; (5) without plaintiff's consent; and (6) that the defendant's use of a similar

mark is likely to cause confusion." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F.

Supp. 3d 869, 900 (S.D.N.Y. 2016) (quoting *Gelicity UK Ltd. v. Jell-E-Bath, Inc.*, No. 10–cv–

5677 (ILG) (RLM), 2013 WL 3315398, at *3 (E.D.N.Y. 2013)).  The parties' dispute in this case

centers on the first of these requirements.

"An unregistered mark, such as [Anthem's "SportPod™" mark],[4] can be protected under

the Lanham Act if it would qualify for registration as a trademark." *Lopez v. Gap, Inc.*, 883 F.

Supp. 2d 400, 414 (S.D.N.Y. 2012); *see also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S.

763, 768 (1992) ("[I]t is common ground that § 43(a) [of the Lanham Act] protects qualifying

unregistered trademarks and that the general principles qualifying a mark for registration under §

2 of the Lanham Act are for the most part applicable in determining whether an unregistered

mark is entitled to protection under § 43(a).").  "In order to be registered, a mark must be capable

of distinguishing the applicant's goods from those of others." *Two Pesos, Inc.*, 505 U.S. at 768

(citing 15 U.S.C. § 1052).  To meet this threshold, a "mark may either be (1) inherently

distinctive, where its intrinsic nature serves to identify its particular source; or (2) distinctive by

virtue of having acquired a secondary meaning in the minds of consumers." *Lopez*, 883 F. Supp.

2d at 414 (internal quotation marks omitted).  In addition, "to be protected under the Lanham

Act, a mark must also be 'used in a way sufficiently public to identify or distinguish the marked

---

[4]  The plaintiffs do not directly opine upon the registration status of the "SportPod™" mark and do not argue in their opposition that they have registered the purported mark.  (ECF No. 46 at 12-13).  Further, despite the defendants' challenge to the status of the mark, the plaintiffs do not provide any representation that the mark has been registered with the United States Patent and Trademark Office.  As a result, I assume for the purposes of this ruling that the alleged mark is unregistered. *Felske v. Hirschmann*, No. 10 CIV. 8899 RMB, 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A Plaintiff effectively concedes a defendant's arguments by his failure to respond to them.").

goods in an appropriate segment of the public mind as those of the adopter of the mark.'"  *Id.*

(quoting *Gameologist Grp., LLC v. Scientific Games Int'l, Inc.*, 838 F. Supp. 2d 141, 154

(S.D.N.Y. 2011)) (emphasis omitted).  The defendants contend that the plaintiffs have failed to

allege facts satisfying the latter of these requirements, asserting that "Anthem offers only the

most cursory allegations about its adoption of the ["SportPod™" mark]."  (ECF No. 41-1 at 15).

This argument lacks merit.

The plaintiffs allege in their complaint that Anthem "began offering" products under the

trade name "SportPod™" before UTW's alleged infringement.  (ECF No. 38 at ¶ 1).  Thus, they

have alleged that Anthem used the mark in commerce.  *Contrast Pub. Free Will Corp. v. Verizon*

*Commc'ns Inc.*, No. 15CV6354RRMJO, 2017 WL 1047330, at *4 (E.D.N.Y. Mar. 17, 2017)

(dismissing Lanham Act trademark infringement claim due to plaintiff's failure to allege that its

marks had been used in connection with actual services).  The defendants would require the

plaintiffs to plead a laundry list of allegations concerning its use of the "SportPod™" mark,

including the date it adopted the mark, the date of its first sale using that mark, and records of its

sales to customers.  (*See* ECF No. 41-1 at 15).  Such information extends beyond the

requirements of a well-pleaded complaint.  Rather, like all fact-intensive inquiries, the empirical

intricacies of whether Anthem used its "SportPod™" in a sufficiently public manner are best left

for a later stage of the case.  *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d

196, 213 (S.D.N.Y. 2015) (noting that "fact-intensive inquiries are ill-suited for resolution at the

motion to dismiss stage (internal quotation marks omitted)); *cf. In re Connecticut Mobilecom,*

*Inc.*, No. 02-02519 WHP, 2003 WL 23021959, at *10 (S.D.N.Y. 2003) ("[T]he issue of whether

a trade name has acquired secondary meaning [in the minds of consumers] is a question of fact

and therefore not appropriately decided on a motion to dismiss.").  Thus, the defendants' motion

to dismiss the trademark infringement claim cannot be granted on the basis that the plaintiffs' "SportPod™" mark does not warrant protection.

The defendants' remaining contention that the plaintiffs have failed to include sufficient allegations concerning the alleged infringement, (ECF No. 41-1 at 15), also lacks merit. The plaintiffs have alleged that UTW used their "SportPod™" mark and or a confusingly similar mark in commerce in connection with the sale of its goods without the plaintiffs' consent. (ECF No. 38 at ¶ 19). Nothing else is required at this point of the litigation. Thus, the defendants' motion to dismiss is denied with respect to the plaintiffs' trademark infringement claim under the Lanham Act concerning the "SportPod™" mark.

## C. Common Law Trademark Infringement Claim (Count Five)

The parties are in agreement that the test for trademark infringement under Connecticut law is identical to the test under the Lanham Act. (ECF No. 41-1 at 15-16; ECF No. 46 at 12). I agree. *See Verilux, Inc. v. Hahn*, No. 3:05CV254(PCD), 2007 WL 2318819, at *10 (D. Conn. 2007) ("The test for trademark infringement and unfair competition under Connecticut law is identical to the test under the Lanham Act."). Therefore, the plaintiffs' trademark infringement claim, which consists of the same allegations as its trademark infringement claim under the Lanham Act—i.e., the claim involving the "SportPod™" mark—survives the defendants' motion to dismiss.

## D. Tortious Interference with Business Expectancies Claim (Count Six)

The Connecticut Supreme Court "has recognized that the legal theory of tortious interference with a business expectancy encompasses a broad range of behavior." *American Diamond Exchange, Inc. v. Alpert*, 101 Conn. App. 83, 90 (2007) (citing *Blake v. Levy*, 191 Conn. 257, 261 (1983)). A party setting out a tortious interference with business relations claim

must allege the following elements: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000). The party must also establish "that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . *or* that the defendant acted maliciously." *Robert S. Weiss and Associates, Inc. v. Wiederlight*, 208 Conn. 525, 536 (emphasis added) (quoting *Blake*, 191 Conn. at 260-61). "In the context of a tortious interference claim, the term malice is meant not in the sense of ill will, but intentional interference without justification. . . . In other words, the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]." *American Diamond Exchange, Inc.*, 101 Conn. App. at 90-91 (internal quotation marks omitted). Thus, "a claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Blake*, 191 Conn. at 262 (quoting *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978)).

The defendants contend that the plaintiffs' claim fails because it is based on non-tortious conduct, (ECF No. 41-1 at 21), but this assertion appears to be based on an unduly narrow reading of Connecticut law. The plaintiffs' tortious interference claim avers that the defendants have interfered with Anthem's business relationships with customers through Mr. Pescovitz's Facebook comments disparaging the Anthem Pods. (ECF No. 38 at ¶¶ 66-69). In addition, the plaintiffs allege that Mr. Pescovitz made these comments with full knowledge of the lack of "any legitimate basis" for them and in "bad faith to unlawfully stifle competition." (*Id.* at ¶¶ 68-69). Such allegations sufficiently allege the type of wrongful conduct that Connecticut courts have found to be actionable tortious interference with business expectancies under Connecticut law.

*See American Diamond Exchange, Inc.*, 101 Conn. App. at 91 (affirming trial court's finding that defendant acted maliciously for purposes of tortious interference claim due to her "improper motive").[5]

The defendants' contention that the plaintiffs have failed to "identify any potential customers of [Anthem's products] who viewed [Mr. Pescovitz's Facebook comments] and then decided not to purchase [Anthem's products]," (ECF No. 41-1 at 21-22), also does not set forth a basis for dismissal. To set out a plausible tortious interference claim, a plaintiff must plead facts demonstrating "that, except for the tortious interference of the defendant, there was a reasonable probability that the plaintiff would have entered into a contract or made a profit." *Dreamcatcher Software Dev., LLC v. Pop Warner Little Scholars, Inc.*, 298 F. Supp. 2d 276, 287 (D. Conn. 2004) (quoting *Goldman v. Feinberg*, 130 Conn. 671, 675 (1944)). The plaintiffs' complaint notes that various potential customers have expressed interest in purchasing Anthem Pods on Anthem's Facebook page. (ECF No. 38 at ¶ 66). Further, Exhibit F of the plaintiffs' complaint demonstrates that the majority of Mr. Pescovitz's comments were aimed at customers who had expressed enthusiasm for Anthem's products. (*See id.*, Exhibit F, at 2 (Mr. Pescovitz's comment is a response to a customer expressing interest in purchasing Anthem Pods), 4 (same), 5 (same), 6 (same), 8 (same)). Thus, the plaintiffs' complaint contains sufficient facts to demonstrate that,

---

[5] There is admittedly some uncertainty in Connecticut law about what constitutes malice for the purpose of tortious interference. *Compare American Diamond Exchange, Inc.*, 101 Conn. App. at 90-91 (improper motive can satisfy malice requirement) *with Golembeski v. Metichewan Grange No. 190*, 20 Conn. App. 699, 703 (1990) ("[T]o substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort."). The defendants do not cite any case law, however, stating definitively that tortious interference requires an allegation that the defendant engaged in independent tortious conduct. Instead, they argue only that "like the CUTPA and Lanham Act claims, [the plaintiffs' tortious interference] claim[] fail[s] because [it] rel[ies] on nonactionable opinion or puffery." (ECF No. 41-1 at 21). This conclusory assertion does not justify the dismissal of the plaintiffs' tortious interference claim.

at the very least, Mr. Pescovitz's derogatory comments targeted enthusiastic potential customers. These facts, liberally construed, set out a plausible claim that some of these potential customers did not purchase the Anthem Pods due to Mr. Pescovitz's comments.

Finally, the defendants' argument that the plaintiffs did not sufficiently allege "actual loss" is a nonstarter. (ECF No. 41-1 at 22). The plaintiffs alleged in their tortious interference count that "[a]s a direct and proximate result of UTW's tortious interference, Anthem has suffered and will suffer substantial irreparable harm and damages." (ECF No. 38 at ¶ 70). Such an allegation satisfies the plaintiffs' minimal burden at this stage of the litigation.

I therefore deny the defendants' motion to dismiss the plaintiffs' tortious interference with business expectancies claim.

### E. CUTPA Claim (Count Seven)

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). In determining whether a practice violates CUTPA, a court must consider three criteria:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . .

*Ulbrich v. Groth*, 310 Conn. 375, 409 (2013) (quoting *Harris v. Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350-51 (2010)). The plaintiffs' CUTPA claim concerns three courses of alleged conduct: (1) Mr. Pescovitz's comments on Anthem's Facebook page; (2) UTW's conduct in "inducing Anthem to invest significant resources and efforts in marketing and selling the UTW Personal Enclosures by promising Anthem that it would be the exclusive

distributor for such products other than UTW and then selling the UTW Personal Enclosures to Dick's Sporting Goods for resale"; and (3) UTW's infringement of Anthem's "SportPod™" mark. (ECF No. 38 at ¶¶ 72-74). The defendants assail all three of these alleged bases. (ECF No. 41-1 at 16).

As an initial matter, the plaintiffs' trademark infringement claim sets out a viable CUTPA claim inasmuch as it states a viable claim under the Lanham Act. *See Pfizer, Inc. v. Miles, Inc.*, 868 F. Supp. 437, 442 (D. Conn. 1994) ("A violation of the Lanham Act is a *per se* violation of CUTPA."). The allegations concerning Mr. Pescovitz's comments on Anthem's Facebook page are a different story. "Although a Lanham Act violation is a per se violation of CUTPA, a party need not successfully assert a statutory claim to maintain a CUTPA claim." *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 596 F. Supp. 2d 497, 506 (D. Conn. 2009). Statements of opinion or puffery, however, generally do not give rise to CUTPA liability. *See U.S. Bank Nat. Ass'n v. PHL Variable Ins. Co.*, No. 12 CIV. 6811 CM JCF, 2013 WL 791462, at *6 (S.D.N.Y. 2013) ("CUTPA claims cannot be based on mere puffery or other statements of opinion."); *Web Press Services Corp. v. New London Motors, Inc.*, 205 Conn. 479, 483 (1987) (affirming trial court's conclusion that salesman's representations as to condition of car were "mere 'puffing'" and therefore did not give rise to CUTPA liability). As noted previously, Mr. Pescovitz's comments on Anthem's Facebook page were opinions or puffery. As a result, I conclude that his statements do not support CUTPA liability.

The plaintiffs' allegations concerning UTW's alleged false promises to Anthem presents a closer question. The defendants contend that these allegations are insufficiently pled and, even if accepted, establish little more than a breach of contract, which "is not sufficient to establish a violation of CUTPA." (*See* ECF No. 47 at 10 (quoting *Boulevard Assocs. v. Sovereign Hotels,*

*Inc.*, 72 F.3d 1029, 1039 (2d Cir. 1995))).  Although "a simple breach of contract would not be within the criteria for a CUTPA claim, substantial aggravating circumstances attending the breach would sustain such a claim."  *Crossroads Commc'ns of Old Saybrook, LLC v. Tower Ventures, Inc.*, No. 3:03 CV 00459 PCD, 2004 WL 2750321, at *4 (D. Conn. 2004).  Here, the plaintiffs allege sufficient aggravating circumstances to set out a cognizable CUTPA claim.  The plaintiffs' complaint recounts that UTW not only violated its contract with Anthem, but then proceeded to make baseless infringement threats against Anthem when the company attempted to sell its own products in lieu of those from UTW.  The plaintiffs' trademark infringement allegations also constitute aggravating circumstances.  Thus, when the plaintiffs' breach of contract allegations are combined with the other circumstances of this case, they give rise to a cognizable CUTPA claim.

The plaintiffs' CUTPA claim may therefore move forward with respect to UTW's alleged breach of contract and trademark infringement.

### F.    Common Law Unfair Competition Claim (Count Eight)

The Connecticut Supreme Court has recognized "under the umbrella term of 'unfair competition' such causes of action as tortious interference with business expectancy; and unjustifiable interference with any [person's] right to pursue his [or her] lawful business or occupation."  *Larsen Chelsey Realty Co. v. Larsen*, 232 Conn. 480, 501 n. 23 (1995).  Beyond this, the extent of common law unfair competition under Connecticut law is somewhat unclear.  Nonetheless, the exact extent of the plaintiffs' claim is of little moment here, as the defendants' sole argument to dismiss the claim is that it is coextensive with the tortious interference with business expectancies claim.  (*See* ECF No. 41-1 at 21).  Given my resolution of the latter claim, the defendants' argument fails.

I therefore deny the defendants' motion to dismiss with regard to the plaintiff's common law unfair competition claim.

**IV.     Conclusion**

For the reasons set forth above, the defendants' motion to dismiss (ECF No. 41) is hereby GRANTED IN PART AND DENIED IN PART.  The plaintiffs' false designation of origin and false advertising claims under the Lanham Act are dismissed.  The plaintiffs' CUTPA claim may move forward only with respect to UTW's alleged breach of contract and trademark infringement.  The defendants' motion to dismiss is otherwise denied.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                March 6, 2018